GRAY, Justice.
[¶1] Two years after entry of an Order Approving Stipulation on Paternity, Custody and Visitation, Jacob A. Smith (Father) filed a complaint to modify custody claiming there was a material change in circumstances. After a two-day hearing on the matter, the district court determined there had been no material change and denied Father's complaint. He appeals from that decision. We affirm.
ISSUE
[¶2] We consolidate the issues presented by Father into a single issue:
Did the district court abuse its discretion when it determined no material change of circumstances occurred?
FACTS
[¶3] In March 2013, Corinda D. Kelly (Mother) and Father had a brief sexual encounter. At the time, Mother was dating Mr. Kelly. When Mother discovered she was pregnant, she believed Mr. Kelly was the father of the child. The child, D, was born on December 3, 2013. Mother and Mr. Kelly married the same month. Shortly after D's birth, genetic testing established Mr. Kelly was not D's biological father. Mother immediately informed Father of the results. Mother, D, and Mr. Kelly moved to Florida in the spring of 2014. In August 2014, Mother and D returned to Wheatland, Wyoming, and moved in with D's maternal grandmother.
[¶4] Father lived in Torrington with his mother and stepfather. Shortly before Mother and D returned to Wyoming, Mother contacted Father to ask if Father wanted to be part of D's life. Father said yes and on October 24, 2014, filed a Petition to Establish Paternity, Custody and Support. Subsequently, Mother and Father filed a stipulated agreement establishing joint legal custody with Mother having primary residential custody. The stipulation contained a visitation schedule and child support calculations, along with other arrangements for D's care and financial well-being. On August 11, 2015, the district court entered an order approving the stipulation.
[¶5] Father filed a complaint to modify the order on custody and visitation on September 15, 2017. Father alleged there had been a change in circumstances due to Mother's instability, referencing her numerous jobs, numerous addresses, numerous romantic relationships, and her emotional volatility. He also claimed the home was unsafe due to the presence of various pets and Mother's failure to clean the house.
[¶6] The district court heard evidence on the modification of custody on May 21 and *299 22, 2018. Mother, Father, maternal grandmother, paternal grandmother, Mother's doctor, and two of D's daycare providers testified. The evidence established Mother, Father, and their parents, worked together to raise D. There were no visitation issues. When the visitation schedule needed to be changed, Mother and Father cooperated with each other to make sure D could spend quality time with both parents. If necessary, the grandparents would assist with babysitting and facilitate exchanges for visitation. When D was upset about leaving Mother for visitation, Mother would talk to D about all the fun things D would do with Father until D was eager to begin the visit. Mother and Father communicated regularly about D's health, school, emotions, and other information parents share regarding their child. There is no question that D is surrounded by loving parents and family.
Mother's Jobs
[¶7] During the period from the 2015 stipulated order until the 2018 hearing on Father's motion to modify custody, Mother held five different jobs. Her first three jobs did not include any benefits. In March 2016, she accepted her fourth job because she believed it would be full-time employment with benefits. She worked at this job for several months, but when she did not get the promised hours and benefits, she accepted her current full-time position which provides health, dental, vision and life insurance, as well as a 401(k). During the relevant time, there was only one two-week gap in employment.
Mother's Residences
[¶8] Mother also lived in four different locations from 2015 to the present. She and D lived in a one-bedroom duplex for almost two years before moving to the other half of the duplex (the landlord had remodeled it and planned to do the same for the side Mother was renting). Next, Mother and D moved to a two-bedroom trailer house with a fenced backyard and a laundry building. She then moved to the two-bedroom house where she and D currently reside. During this time, Mother owned various pets. There were times when the residences were dirty or unkempt. When Father would pick D up, he also took pictures of the house with dirty dishes, soiled laundry, or other indications of uncleanliness.
Mother's Relationships
[¶9] Mother has had several romantic relationships since the district court's custody order. In the late spring of 2015, Mother began dating Mr. O. In May 2016, after the couple became engaged, Mother and Mr. O got into a fight. He threw Mother against a pantry door and then pressed his arm against her collar bone and neck. Mother returned the engagement ring and told Mr. O to "pack his stuff and leave." The physical assault left Mother with bruises on her arm and neck and a sore back. D was visiting Father and was not present during the altercation. When Mother went to get D from Father, she told Father about the incident and said her back hurt when she lifted D.
[¶10] After the incident with Mr. O, Mother had two other dating relationships before meeting Mr. W, her last boyfriend, who she began dating in March 2017. In April or May, Mr. W told Mother he had an upcoming court date because his prior girlfriend had accused him of abuse, even though it was merely "rough play." Mother testified she didn't know what to believe, but she wanted to give Mr. W the benefit of the doubt.
[¶11] Two incidents involving Mr. W are at the core of Father's argument on appeal. The first incident occurred on May 18, 2017. Mother testified she left the home for a short period to assist a co-worker. When she returned, D was wrapped in a bath towel and there were tear streaks on D's face. D's buttocks were bruised. When Mother asked Mr. W what happened, he told her he didn't know, but "assumed" D had fallen on some toy dinosaurs while getting out of the tub. Mother asked D what happened, and D replied, "I don't know." She asked D if he was spanked, but D said "no." Mother testified she was suspicious of Mr. W's story, but could get no further information despite repeatedly questioning D. She told Mr. W she did not trust his story and he wasn't to be alone with D or to administer punishment.
*300 [¶12] Mother sent a text to Father the next day stating D had bruised buttocks from falling on a toy dinosaur. She did not tell Father she was not home at the time of the injury, nor did she relate any suspicions about Mr. W. Father took D for visitation and photographed the bruises.[1] At the hearing, Father testified he did not know who caused the bruising, Mother or Mr. W, but he didn't believe D fell on a toy dinosaur "for a minute." Even so, Father never mentioned the incident or his concerns to Mother or Mr. W. There was no evidence similar incidents occurred while Mr. W was in the home.
[¶13] The second incident is the culmination of a series of events. In August 2017, Mother became pregnant with Mr. W's child. Due to her pregnancy, Mother stopped taking one of her anxiety medications. On approximately September 6, 2017, Mother and Mr. W were arguing in D's presence. Mr. W told Mother they needed to talk, and they went into the bedroom. Mr. W shut and locked the door. Mother said she wanted to leave and go to D. Mr. W blocked her way. Mother repeatedly told Mr. W to let her out. When she attempted to get by him, he shoved her onto the bed. Mother got back up to leave. When Mr. W would not let her leave, Mother punched him in the face. Mr. W stepped aside. Mother immediately left the room and she and D left the premises.
[¶14] Shortly after this incident, Mother began to feel abdominal pain and was put on bedrest. Later, on September 12, the same day Mr. W pled guilty to the misdemeanor sexual battery charges in his unrelated case, Mother suffered a miscarriage.[2]
[¶15] Some time after this incident, Mr. W contacted Father and told him Mother had assaulted him and was out of control. After learning Mr. W had talked to Father, Mother telephoned Father to let him know she had been depressed and upset since the miscarriage but had reached out to her doctor and made an appointment. She said she knew she needed help and was seeking this help on her own. Mother asked Father if there was any secret agenda going on. Father said no and assured her "they were good." A few days later, Mother was served with a motion for modification of custody.
[¶16] After the May 2018 hearing, the district court found the changes in employment and Mother's financial situation were of little concern because there were only short periods of unemployment and she is current on her bills.[3] The district court acknowledged that Mother's changes in residence "may have created some instability for D," but concluded Mother's current living situation is "appropriate and safe." As to her boyfriends, the court found no evidence to suggest D had been negatively affected by the number of relationships and there was no evidence D was "confused about who his dad is or about Mother's boyfriends." The court determined the cleanliness of the home and the number of pets did not significantly affect D's welfare.[4] More importantly, D's medical records showed he is "well-nourished and well-groomed, and that mother's behavior is appropriate."
[¶17] The district court recognized Mother suffers from depression, anxiety, and bipolar disorder. However, the court stated:
Certainly, her emotional state was unstable during the fall of 2017. She was dealing with a second pregnancy ending in miscarriage, an abusive boyfriend with legal problems, and not long after, a petition to modify custody of her son. The recorded *301 phone conversation does demonstrate this state of distress, but in the same conversation she informed Father that she recognized her problem and was dealing with her manic episodes and anxiety. The Court believes mother did have significant emotional distress, but she is improving and taking appropriate steps to control her depression, bipolar disorder, and anxiety, and is therefore not 'emotionally unstable.'
[¶18] Finally, the district court addressed the issue of most concern-abuse. The court considered evidence of spousal or child abuse as being contrary to D's best interest under Wyo. Stat. Ann. § 20-2-201(c). However, it determined the two isolated incidents of violence directed at Mother by boyfriends were not enough to demonstrate a material change in circumstances. The court found no evidence that D observed or was harmed by either incident. While the court believed D overheard some of the fight between Mother and Mr. W, it concluded Mother swiftly resolved the situation.
[¶19] More concerning to the court was the bruising on D's buttocks. It found the bruising was caused by Mr. W hitting D-not from a fall on toys. The district court noted Mother did not relate her suspicions to Father nor did she tell Father she was not at home when the incident occurred. The court observed:
Continued or further poor choices such as these, including a failure to inform Father or leaving the child with someone like Mr. W[ ], is not in D[ ]'s best interests. Even so, the Court believes this was an isolated incident that occurred when Mother was unavailable. Dating Mr. W[ ] was obviously a poor choice on Mother's part, but D[ ] has not suffered any noticeable issues as a result of their relationship, which has since been terminated.
The court concluded, while this was a close case, there was no "material change in circumstances ... such that would warrant re-opening the parties' Order Approving Stipulation on Paternity, Custody and Visitation ...."
STANDARD OF REVIEW
[¶20] We review child custody determinations as follows:
Decisions affecting child custody rest within the sound discretion of the district court. We will not disturb the district court's findings absent procedural error or a clear abuse of discretion. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily and capriciously. Our primary goal in reviewing for an abuse of discretion is determining whether the district court's decision is reasonable. We view the evidence in the light most favorable to the district court's determination, affording to the prevailing party every favorable inference and omitting from our consideration conflicting evidence.
Kappen v. Kappen , 2015 WY 3, ¶ 10, 341 P.3d 377, 381 (Wyo. 2015) (internal citations and quotations omitted).
DISCUSSION
[¶21] A district court:
may modify an order concerning the care, custody and visitation of [a child] if there is a showing ... of a material change in circumstances since the entry of the order in question and that the modification would be in the best interests of the [child] pursuant to W.S. 20-2-201(a).
Wyo. Stat. Ann. § 20-2-204(c) (LexisNexis 2017). We require the court to conduct a two-step inquiry:
The first step requires a showing that there has been a material change in circumstances since the entry of the order in question. Because of the res judicata effect afforded custody orders, such a finding is a threshold requirement. The district court does not properly acquire jurisdiction to reopen an existing custody order until there has been a showing of a substantial or material change of circumstances which outweigh society's interest in applying the doctrine of res judicata to a custody order. In short, unless the district court finds a *302 material change in circumstances, it cannot proceed to the second step-determining whether a modification would be in the best interests of the child.
Jacobson v. Kidd , 2018 WY 108, ¶ 16, 426 P.3d 813, 820-21 (Wyo. 2018) (internal quotations and citations omitted). Father, as the party seeking modification, has the burden of proving a material change in circumstances has occurred since the entry of the Order Approving Stipulation on Paternity, Custody and Visitation. Id. ¶ 17, 426 P.3d at 821.
[¶22] Father argues the district court failed to correctly weigh the following undisputed facts: the incidents of abuse; Mother's instability as exhibited by her multiple boyfriends, jobs and addresses; and her financial struggles. He claims the district court's conclusion D "has not suffered any noticeable issues" is contrary to the undisputed evidence of abuse.[5] Father emphasizes that he has been employed for two years, has bought and is remodeling a home, and Father has paid not only his share of the medical bills, but Mother's as well. Father claims this evidence shows his stability has dramatically increased since the initial custody order, while mother has barely maintained the same level of ability to care for D.
[¶23] "The district court [must] evaluate[ ] 'the current circumstances of the parties in relation to their circumstances at the time [of]' " entry of the governing order. Jacobson , ¶ 17, 426 P.3d at 821 (emphasis added). Here, the district court's conclusion that there was no material change in circumstances is well supported by the evidence. At the time of the hearing, Mother had found a full-time job with benefits. Mother's moves within Wheatland were either necessary (remodel of the first duplex) or an improvement over the last residence. There was no evidence of any disruption to D's schooling, medical care or family relationships while in Mother's care. The district court carefully considered the bruising incident and the obvious immediate harm to D, but acknowledged the bruising occurred almost a year before the hearing and was not likely to occur again since Mr. W was no longer in the picture. It is undisputed Mother and Father regularly communicated about all aspects of D's life. Yet, Father did not consider the incident serious enough to speak with either Mother or Mr. W about the bruising even though he testified he believed it was caused by one of them. Finally, there was no evidence of any further discipline by Mr. W while he was at the home. Mother has sought appropriate help when needed and has complied with all her doctor's directions. Her emotional condition is stable. There is no evidence Mother has issues with alcohol or drugs.
[¶24] This is not a case where the district court ignored "the obvious or natural effects of a situation" in reaching its decision. Jacobson , ¶ 19, 426 P.3d at 821. In Jacobson , we reversed the district court's conclusion there had been no change in circumstances because the district court required objective evidence of an adverse effect on the children to find a change in circumstances. Id. We noted "[a] circumstance may have relevance in a child's life before there are outward signs of harm." Id . The facts in Jacobson , however, were vastly different than the facts in this case. There, mother's violent relationship with her boyfriend was ongoing; mother had refused court-ordered counseling and failed to take the children to counseling; mother had continuous run-ins with law enforcement; mother had problems with alcohol and prescription drugs, id . ¶ 12, 426 P.3d at 818 ; and mother's hostility toward father was worsening. Id . ¶ 30, 426 P.3d at 823. Further, the children were diagnosed with adjustment disorders. Id . ¶ 32, 426 P.3d at 824. One child had trouble making or keeping friends. Id . In light of this evidence, we concluded: "[m]other's *303 continued instability and poor decision-making, her unwillingness to address the issues through counseling and the parties' inability to make the current custody/visitation arrangement work affect [the children] and, therefore, amount to a material change of circumstances." Id . Here, there are no such ongoing issues.
[¶25] Importantly, Mother and Father are models of cooperative co-parenting. Both parties assured the district court they would continue this behavior no matter what the outcome of the hearing. In fact, the district court commended the parents "for working together to raise, from what the evidence shows, is a happy, healthy child who loves spending time with both parents." This Court will not retry the case on appeal. ELA v. AAB , 2016 WY 98, ¶ 18, 382 P.3d 45, 50 (Wyo. 2016). We find no abuse of discretion in the district court's decision.
[¶26] Affirmed.

The photograph of D's bruises was admitted as Father's Exhibit 6. There is some question whether the photograph is an accurate depiction of the injuries. Mother testified she recalled the bruises "were less dark." When shown Exhibit 6 paternal grandmother testified, "I don't recall them [the bruises] being that bad" and "I don't recall what I saw in person being as significant as what that photo showed." However, it is uncontested that D had bruising.

Mr. W left the home shortly after his court date for work travel. He moved out of the home in November 2017 and no longer lives in Wheatland. Mother has not had contact with Mr. W since he moved and has had no other relationships since he left.

At the time of hearing, Mother and Father disputed an amount she owed on D's medical bills.

The various animals were not in the home at the same time, and Mother currently had only one fish.

For the first time in his brief, Father asserts Wyo. Stat. Ann. § 20-2-201(c) -which identifies spousal and child abuse as contrary to the best interest of the child-has, in essence, legislatively defined such abuse as a material change in circumstances. Father did not raise this issue to the district court, nor does he cite any authority to support this contention in his appellate brief. Therefore, we will not consider his argument raised for the first time on appeal. Yates v. Yates , 2003 WY 161, ¶ 13, 81 P.3d 184, 188 (Wyo. 2003) (we do not consider issues "neither raised in, nor argued to, the [district] court except for those issues which are jurisdictional or are fundamental in nature") (quotations and citations omitted).